Ingredients v. OSHC All right, Ms. Cage. May it please the Court. Darling Ingredients asks this Court to vacate the Occupational Safety and Health Review Commission's decision for two main reasons. First, the citations herein are not properly characterized as repeat violations because they're not substantially similar to the predicate violations. And second, Darling has no knowledge that its lockout-tagout procedure was deficient. The Occupational Safety and Health Act provides for penalties to be assessed against employers who violate regulations and standards issued under the Act. And the Act also provides for increased penalties for any employer who willfully or repeatedly violates the Act or standards made pursuant to the Act. But the Act does not define repeatedly, and the Commission and courts have tried to define the term but with no consistent or authoritative answer. The Commission clarified repeatedly in the Potlatch decision explaining that a violation is repeated under the section, sorry, the violation is repeated under the Act if at the time of the alleged repeated violation there was a Commission final order against the same employer for a substantially similar violation. Then the Secretary may show similarity by showing that the prior and the present violations are for failure to comply with the same standard. The burden then shifts to the employer at that point to rebut the showing of similarity with evidence of disparate conditions and hazards associated with the violations of the same standard. So when the present and the prior violations are for failure to comply with the same standard, the Secretary meets its burden of proving the violations are substantially similar. But like I said, the analysis does not end there. The employer then has the opportunity to rebut the showing by showing the disparate conditions and hazards associated with the same standard. So the fact that an employer is cited multiple times under the same standard isn't dispositive of the issue as the Commission has held here. And to ignore the evidence of dissimilarity between the predicate violations and the violations at issue and instead find that the violation of the lockout-tagout standard, no matter how different the circumstances involved or the procedure, the lockout-tagout procedure itself is, would effectively impose strict liability on the employer for repeat violations, unfairly subjecting them to the enhanced penalties without regard to whether or not they had notice in the first place of needing to take the steps to correct the hazard. So it's consideration of the conditions and the hazards, not just the actual standard itself that must be considered. So here, in our case, OSHA classified the violations as repeat based on the May 27, 2020, citation at Darling's Kuna, Idaho facility for a violation of the lockout-tagout standard. And the Idaho predicate citation stated that it was for a grinder machine that didn't specify a pneumatic rod that was re-energized, that it wasn't locked out. It went unexpectedly re-energized when an employee had gone to put it back in the socket. So here, the Commission erred in finding that Darling's two violations of the OSHA's lockout-tagout standards were properly characterized as repeat because Darling presented evidence rebutting their similarities, showing they were not substantially similar to Darling's Idaho's violations of the same standards. The two involve very different hazards. The one at issue in our case is a burn hazard caused by steam and the hot meal that was in the machine. And the previous, the predicate citations that involved pneumatic air pressure and the arm that once it was replaced by the employee without locking it out first, it was replaced, the machine re-energized, and it ended up crushing him. So they're two very different hazards created by this unexpected release of energy. And so the hazard and the conditions compared... Let me ask you a question. Aren't the procedures supposed to be, I mean, the reason you got cited for an inadequate procedure was that it wasn't tailored sufficiently to this machine. So I assume you would have to have a different set of procedures for a pneumatic piece of equipment with an entirely different scope of hazard than you would have had for this hydrolyzer, right? That is correct. So I don't understand why that doesn't, those two findings aren't at war with each other. Well, and if I'm understanding you correctly, I agree with you. I think you would agree. Yeah. Yeah, what I'm saying is that if the presumption is you have to have case-specific lockout, tagout procedures, and they're different equipment, different hazards, different things to de-energize or defuse danger, then by definition, the hazards and the conditions are different. Different. And I think here in the underlying decision, the administrative law judge, he differentiates the hazard in two different ways. At one point, he identifies that the hazard in our case was the unexpected release of the steam energy. It wasn't unexpected. Well. I mean, this is a very sad, ludicrous thing. Agreed. And in this particular case, when the steam discharged, it was a very different hazard, a very different situation than the prior case. And I think going beyond that, the reason that there does need to be. Okay. So what case holds that repeatedly has to be exactly the same kind of accident that occurred with the exact same type of machine? So there are a few commission decisions, and there is the Fifth Circuit decision in Deep South Crane and Rigging that does seem to indicate that repeated would be just basic repetition of the standard itself. However, there hasn't been a case yet that actually deals with the lockout-tagout standard itself and the failure to have that specified as needed and as tailored as it should have been, except for underlying, I'm sorry, a commission decision in Angelica Textiles. And in that case, they did deal with the lockout-tagout standard, and they did say repeated. It does not always have to be, you know, it doesn't have to, it's not just a repeat of the standard itself. You do. I mean, you could have different lockout-tagouts for different pieces of equipment in the same factory, right? Correct. But was the Deep South the one that involved dust? Yes. Right. Dust is dust. I mean, I haven't read it recently, but dust is dust. What does, in step two, it says relieve internal pressure. How were the workers supposed to do that? Yes. I mean, there's an allegation that they had to sit tight and wait, but it doesn't say that. You're correct. It does not say that, and I think that's where the rub is in this case. And in the procedure, I know to us and to the average person that doesn't work on these machines, it seems very questionable. But to these maintenance employees that were authorized employees to maintain and service this machine and were trained on this, they knew not only the lockout-tagout policy of the company that was promulgated, but they also knew the specific lockout-tagout procedure to the hydrolyzer. In addition to that, they knew well that the manual said, never open this machine up when it's under pressure. You cannot service this machine at all when it's under pressure. You have to wait. She was an experienced employee. That's the question, and unfortunately we can't get the answer to that. The employee that ordered this had been there for 22 years, and he was in charge of this machine more or less, right? Correct. This implies that he had done this before. The evidence that we have, Your Honor, shows that it had not been done before. No one had knowledge of this actually having occurred. But it was on the night shift, right? I thought there was something about it being the night shift. It may have been, and I'll double-check that in just a moment and answer on rebuttal. Just following up on the differences between the two, I think we've covered that sufficiently. I just wanted to follow up on the Angelica case that I was mentioning from the commission that did actually go over this. This is the only case on point. It was appealed by the Secretary, and the Second Circuit Court of Appeals ended up vacating that decision. But at that time it was because the employer at issue had gone bankrupt and there was no point. If you would agree this issue repeatedly, I mean, I could say, well, it happened in Baton Rouge instead of New Orleans, so it's not the same. You can always find a difference in almost exactly the same thing unless it's like two twins in the same yard. So isn't this the same basic hazard that by failing to have a good procedure they would be exposed to uncontrolled energy? On a general level, yes. But I think that there needs to be more, and I believe that the commission's decisions, and I think even the Fifth Circuit's Deep South Crane and Rigging decision, it does say that there should be a substantial similarity, and that doesn't mean just a repetition of the statute or the regulations. Well, but no, the problem was these people were exposed to uncontrolled energy. The fact that it was a little different over here or over there, why is that critical? So the little differences would not be critical. But the big differences in this situation and in many others is that the machines are very – it's very procedure specific. They're often built or adapted by the – Right, but if they're not handing out procedures on any of their machines, they get away with that because the machines are different, even though everybody's dying from uncontrolled energy? Certainly not, but there does still need to be – I mean, to me the problem is where do we kind of draw the line? Because you could make it super broad, you can make it super narrow, and I respect that lawyers are always going to make the argument for their client, but we're judges. We've got to figure this out. I agreed, and I don't know the answer to that. Same or similar hazard has got to mean something other than it was unexpected and somebody got hurt bad. So just saying it was uncontrolled energy is total – that could be electricity, that could be hot water pouring down on somebody, that could be hot oil, that could be like the lady that was on top of the chicken tumbler in Southern Hands. I mean, that's so vague it's to be meaningless and therefore not due process. Anyway, the Deep South, if I was wrong, was two different cranes. The cranes, yes. So it was not only the same standard, it was the same type of hazard, cranes. Yes. At least they were more closely connected than a puncher in a steam pressure cooker. The second reason that the commission's final decision should be vacated is that it pretty much dovetails with the previous argument, is that Darling did not have notice, based on the Idaho citations, of how its procedure was deficient and that the statement in step six, relieve internal pressure, was deficient. There's no way that the previous citation would have informed Darling that it needed to further alter that because there is no similarity. There's just nothing there to put them on notice of that. You're talking about that. Here, as I take it, you're not challenging the initial citation of inadequacy. This is still regarding the repeat? The repeat violation is the main issue. But, I mean, it's to no knowledge that it was insufficient. What does that go to? It just goes to whether the citation was appropriately given, whether it was correct. It's one of the four factors that is considered in whether they violated. But that's the initial violation. That's not the question of repeat. Correct. Two different questions, yes. Well, I have to say, you know, if this were all there was, then I think the agency is correct, but it says relieve internal pressure when it gets to number six. And, you know, I suppose you would have said do not touch until it cools down, right? Could have, right? They could have, but they all had the understanding and training that they knew nothing else was to be done. I mean, you know, pressure cookers, you know that if you have a mom in a kitchen. But from the standpoint of what OSHA is allowed to require, sometimes it has to be very specific. I say that my time is up. Okay. You have time for a bubble. Ms. Mathis? Well, you're off the hook. They didn't challenge the constitutionality of the ALJ. That's coming up in another court, right? May it please the court? My name is Jessica Mathis for the Secretary of Labor. We're here today because two of Darling's employees died completely preventable deaths, deaths that might have been avoided if Darling had had comprehensive and clear lockout-tagout procedures. Throughout briefing and during argument today, Darling has mischaracterized the issues at the heart of this case in an attempt to reject responsibility for the deaths of its employees. But the record shows that the Secretary did meet her burden to establish the following. One, the standard was violated. Next, that Darling did have knowledge of the violation. Third, that the repeat classification was, in fact, justified here. And additionally, the record shows that the ALJ was well within his discretion to find that the affirmative defense of unpreventable employee misconduct was waived because it was not substantively briefed. And at any rate, the defense would fail. Okay. Well, as you saw in the last discussion with your opponent, we spent a lot of time on repeat. So, as I said, where's the line? Because you can always say something's different because, well, it happened on Wednesday instead of Tuesday. But you can always say something's the same. Well, we all live in the world. Can you please tell us where is that middle that we need to find for repeated and what is it? Yes, Your Honor. I can attempt. So the lockout-tagout standard really was intended to apply to a wide variety of machines, and that's sort of where this issue arises because if it applies to multiple machines, of course, machine-specific procedures to comply with the standards do need to have very specific steps. And so in repeat cases, it's going to be very unlikely that we'll have a repeat citation where the predicate citation and the later citation are missing a step that says exactly the same thing because machines are different and they require different procedures. So you're saying it's the directive that's the same. You need to explain how to avoid this energy issue. Yes, Your Honor. I mean, is that what you're saying? So we heard from your opponent that this is difficult, but she just thinks this didn't meet it. All right. You agree that it's difficult, but how did this meet it because it was a different machine and a different energy problem? Sure. So in this case, yes, absolutely they were different machines. They had different procedures. They could have resulted in different injuries and did, in fact, result in different injuries. Of course they did, yes. Yes. But really the common element here is that these pressurized machines didn't have specific procedures to say how to manage that pressure or how to dissipate the pressure. And in this case, that is enough. That's the common element. Is that what the ALJ said, or did the ALJ talk about de-energizing? Your Honor, the ALJ talked about de-energizing. Go ahead. Excuse me. I apologize, Your Honor. No, mine. In this case, I believe the ALJ did talk about de-energization, but I think that that applies to both machines because in the Idaho machine, I think it was called the Cow Pusher, as opposing counsel explained, this machine became energized while the employee was trying to put a part back in. Well, this machine was de-energized. They had turned off the electricity. They had also turned off the supply of steam. Energy is energy. Yes, Your Honor. And in this case, though, the issue was that there was this stored energy that had accumulated. I well understand that, but I think you're using that at a very high level of generality. And I also believe that you are not allowed to modify the basis on which the ALJ or the commission ruled. Post hoc rationalizations are not allowed. Sure, Your Honor. But in this case, I think that even if the court were to remand, there would be the same outcome because the evidence is still in the record of substantial similarity. Well, I mean, that would be the methodology if we thought that there might be a way that you could prevail, but the ALJ didn't properly address it. We send it back. We don't just reverse and render. That's what you're saying? Yes, Your Honor. In Bunch Corp, the case from, I believe, 20, I'm sorry, from 1981. Yes, Your Honor. In Bunch Corp, which was mentioned earlier, what actually happened in that case, the conditions there that created the hazard was dust accumulation. And in that case, this court decided not to remand at all because it looked at the record and found that there was evidence of substantial similarity. But they all involve dust over a period of years, right? Dust is dust is dust. And you've got you couldn't have taken Mr. Fortenberry and Mr. Jackson and put them in Idaho and had them operate that machine. You couldn't because they're entirely different machines. What is the case that is closest on point? Because our other case, the Deep South, involves cranes. Yes, Your Honor. And actually, in Deep South, while it was two cranes, they were different types of cranes. And the procedures were different. And there was still substantial similarity there. I mean, the problem is this is two machines. They're just different machines. So you say these are two cranes. These are different cranes. The problem I'm having is you can always say something's different and you can always say something's the same. It's just how far you're willing to put your hands out. Right, Your Honor. I agree with you. But if the court were to draw a hard line here and say, you know, well, the procedural steps need to be, you know, incredibly close, they need to be almost the same, then repeat classifications would almost never be possible. I'm sorry, but it was Potlatch. I'm quoting from what I call a bungee, but Bunge says about Potlatch, the employer may then rebut a prima facie case involving prima facie, involving the same standard, same general standard, with evidence of the dissimilarity of the conditions and hazards associated with these violations of the same standard. Well, you have different violations because these tag-out procedures have to be tailored to the machine. So you have a different iteration of the specificity of type of compliance with the written standard. And then you have totally different hazards. I mean, you get in, you know, it could be a die punch, and if you put your hand under there, kaboom. Or it could be southern hens, where they were also cited for some kind of pinch thing on a conveyor belt, but the court said that was not sufficient to have another violation, right? I believe so, Your Honor, yes. Yes, it did. So, you know, you just, I think this case represents apples and oranges, whereas other cases are a much more reasonable, you know, common sense scope of similarity. Well, respectfully, Your Honor, in this case, the condition that created the hazard was exactly the same, and the condition here was having procedures that don't specifically address steps to. Well, I haven't seen the citation in the Idaho case, so I should have read that. I can. If it would be helpful, we can discuss that, actually, because the citations and also the violation worksheet from Idaho is, I would say, pretty illuminating, because both of those point out that, A, this was machine-specific procedures that were lacking the steps, and specifically that the procedures did not provide specific and relevant information about methods to control the energy and methods to dissipate or strain the energy. And that's exactly what's at issue in this case. I also would like to point out that in the Bungee case, this court did quote that case, or excuse me, did quote Potlatch favorably, saying that, for violations of the same specific standard, the two violations almost have to be substantially similar in nature in order to constitute violations of the specific standard. So this court has recognized that there must be some common element. Again, the issue is just... Yeah, that's what I keep asking about, and I'm not sure I've really gotten an answer, because, again, you can find the different... I mean, it's always going to be a different machine, unless it's the exact same building with the exact same machine. So that's, to me, not the question. The question is, are they different enough that the standards would be way off, way different? So the question, like I said, is how do we evaluate that, and how should the ALJ evaluate that? Yes, Your Honor, I understand. Looking really at the purpose of the repeat classification, as opposing counsel said, it's notice. It's did this put the employer on notice to correct other violations that are the same? But that had come out only a month before this accident, right? I mean, the timing of these was pretty close, was it not? It was, Your Honor, and in this case, the Idaho citation, I believe, was June, and immediately after that citation, the corporate safety manager of Darling flew to Idaho and spent two weeks rewriting all of their machine-specific procedures to include more specific procedural steps. So if the question is, was the company on notice? Well, if this was the first time... Again, but you've got two different processing plants, and in this particular case, was this the first time there had been a serious injury arising from the hydrolyzer? As far as I know, Your Honor. Well, there you go, because Mr. Fortenberry had been working there 22 years, hadn't he? I believe so, Your Honor. So it's pretty hard to say. Yeah, so... Okay, but you're saying that having had that experience in Idaho, they should have, across the country, said, take a look and make sure you're okay, because that's exactly what happens when that kind of situation comes up. Instead of just focusing on Idaho, you should focus on the country. Yes, Your Honor, and of course there's no specific standard that I'm aware of that says that if you are cited for this, you need to evaluate all of your procedures from scratch, and that's not what I'm suggesting, but... It sort of is. Respectfully, Your Honor, I... Well, if a ladder isn't properly opened up, the energy is gravitational force that the ladder falls to the ground, and therefore perhaps they have to revise all of their ladder procedures. These were both real energy, right? Yes. So while... Excuse me. While I would not characterize our argument as saying that they need to immediately go and re-evaluate everything they've ever done, but employers are always responsible for complying with the standards, and they are especially responsible... It's an especially pertinent duty if they already have one citation, that this is the purpose of the repeat classification. What about the Tampa, Florida situation? You said it was only Idaho, but... Yes, Your Honor. I believe the Tampa, Florida situation was also a lockout-tagout citation, and I don't think that that factored into our repeat classification in this case, though. That's my understanding. Okay. If there are no further questions about the repeat classification, I'd like to discuss the knowledge element. The record here demonstrates that the employer did have knowledge of the violation, and the employer has attempted to characterize the issue of knowledge as, well, Darling did not know that on August 10th these bolts are being loosened on the flange of the hydrolyzer, but that's actually not really the issue here, because the issue is with these specific procedures. And the secretary has proved that Darling knew the contents of its own lockout-tagout procedure for hydrolyzer A, and the company hasn't denied that it had this knowledge of the procedure. So this attempt to shift focus to the employee's actions is not actually effective here, because the real issue is this actual procedure, and was it specific enough? And it was not, and it clearly was not specific or clear or containing all of the relevant steps, because there is evidence in the record that the employees argued over whether or not it was appropriate to loosen these bolts and to take these actions. And the fact that there wasn't clarity here is a great example of why this standard is so important and crucial for lockout-tagout, because in these crucial moments, employees need to have a clear understanding... Okay, I'm not saying what we will rule, but let's assume, arguendo, that we rule it wasn't repeated but it was a violation. What is the proper thing for us to direct then? Do we remand it to the ALJ, or what do we do in that situation? I would think that... Your Honour, I'm actually not sure, but if supplemental briefing would be helpful, I would be happy to do that. I think you vacate the finding of repeat, and you retain it's just like a partial judgment, if I recall. That would be my best guess, but again, I would have to check that. Okay. How often was this procedure performed or needed? Your Honour, from the record and from the testimony at the hearing, it does sound like this was relatively common. There's not a ton of concrete facts about, you know, this happened X number of times before this accident occurred, but I do believe that this was a relatively common procedure that had to happen. So it's a routine? I'm not sure that it was exactly routine, but it is in the record that clogs in the hydrolyzer were somewhat frequent, and sometimes you could resolve the clogs by using these other methods, which was, you know, doing what they called shuttling the gates, which was opening and closing some of the air vents, and sometimes that would help move things along and fix the issue. But when that didn't work, then you would start this process, which essentially ended with Step 6A, which said relieve internal pressure. That sounds like telling someone to do something rather than to sit and wait. Yes, Your Honor. That instruction is not only misleading, it's actually not correct, because if it's supposedly known, if Darling's expectation was that employees would do nothing and wait for the pressure to relieve itself, that's almost the opposite of an active command that instructs employees to relieve internal pressure. What do you do with this evidence here? There's a hydrolyzer and there's a backup hydrolyzer. When the hydrolyzer is cooling down, maintenance can reroute the material to hydrolyzer B or vice versa. The Mississippi plant installed a duplicate hydrolyzer as a backup system. There was no evidence that the backup was not working, is there? Not that I know of, Your Honor. The product, even if both hydrolyzers are down, the product can sit for days because the feathers do not go bad. So it sounds as if these fellows were on some kind of mission that is very difficult to explain. Yes, Your Honor. And it also sounds to me as if, to be quite blunt about it, I applaud the goal of OSHA to require employers to have good instructions and training and careful written procedures and so on, but that is not what caused these guys to go awry. I mean, that's just my personal opinion. It has nothing to do with the law. Isn't that for the ALJ to determine as opposed to us? Well, the ALJ doesn't determine actually the cause of the accident precipitates the investigation. The accident itself does not determine the scope of the violation. Well, I mean, if they had shot themselves, that would be a different case. Anyway, did you have anything further to say on this? I see I only have one minute left, but I would like to add that there is no evidence in the record that this information beyond the vague instruction, relieve internal pressure, was included in any. It's not included in the general lockout-tagout policy. There's no evidence in the record that it's in the training materials, and so really it sounds to me like the employer was expecting that word of mouth would just get this procedure around, and that's simply not enough under this standard. It must be documented. If there are no further questions, I will respectfully take these. No, ma'am. Thank you. Thank you. All right, Ms. Gage, rebuttal. Just briefly, I did want to address your one question on where the clogs frequent. And the record does show that they were routinely cleaned out by unbolting the flange. That was only done when all the pressure in the machine was relieved. It was never done before when there was still pressure in the machine. Another point that I wanted to make is, again, that there was another hydrolyzer available at the time, and the evidence in the record that we do have is the unrebutted testimony of Wayne Stanberry, the company head who explained that this, I'm sorry, that the procedure was only ever done, they were only trained to do it when the hydrolyzer was completely relieved, when all the steam pressure was completely relieved. And so that testimony is replete in the record, which you will see, if you haven't already, that that is in there. Now, Mr. Fortenberry and Mr. Jackson died, right? Correct. What happened to Mr. Young? I don't know. Did he left or walked away or something like that? I believe he did sustain injuries. They just weren't fatal. From the steam. From the steam, yes. The steam and it was the hydrolyzer pulverized poultry feathers and made like a meal that was used, a byproduct that was used in other foods later on down the line. So a mixture of the meal and the steam pressure was what caused the injuries to the gentleman. Anything else? Nothing. All right. Thank you. We have your argument. We will take.